20-3224; 22-70
*Black v. Decker; G.M. v. Decker*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2022

(Argued: January 5, 2023    Decided: May 31, 2024)

No. 20-3224

CAROL WILLIAMS BLACK,

*Petitioner-Appellee,*

–v.–

DIRECTOR THOMAS DECKER, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF NEW
YORK FIELD OFFICE OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,
ALEJANDRO MAYORKAS, SECRETARY OF U.S. DEPARTMENT OF HOMELAND
SECURITY, SHERIFF PAUL ARTETA, IN HIS OFFICIAL CAPACITY AS SHERIFF OF
ORANGE COUNTY, NEW YORK,

*Respondents-Appellants.*

-------------

No. 22-70

KEISY G.M.,

*Petitioner-Appellant,*

–v.–

THOMAS DECKER, NEW YORK FIELD OFFICE DIRECTOR FOR U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT, MERRICK B. GARLAND, UNITED STATES
ATTORNEY GENERAL, ALEJANDRO MAYORKAS,

*Respondents-Appellees,*

DAVID L. NEIL,

*Defendant-Appellee.*\*

————————

B e f o r e :

CHIN and CARNEY, *Circuit Judges.*†

————————

These tandem appeals arise from habeas petitions brought under 28 U.S.C. § 2241 by legal permanent residents Carol Williams Black, in No. 20-3224 (Schofield, *J.*), and by Keisy G.M., in No. 22-70 (Cronan, *J.*). As directed by 8 U.S.C. § 1226(c), the government detained Black and G.M. pending their removal proceedings: Black, for seven months, and G.M., for twenty-one months. Neither had a bond hearing when first detained or during detention. Section 1226(c) mandates detention for noncitizens who are charged with removability based on certain prior convictions or on allegations of involvement with terrorism. As grounds for habeas relief, Black and Williams each asserted that the prolonged detentions without any bond hearing violated their Fifth Amendment due process rights. The district court adjudicating Black's petition granted relief, and he was released; the district court adjudicating G.M.'s petition denied relief. (He was later released for pandemic-related reasons.) Because each remains subject to possible detention, their appeals are not moot. On de novo review, we conclude that the

————————

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Paul Arteta—the current Sheriff of Orange County—is automatically substituted in the caption for his predecessor in that office as a defendant in No. 20-3224. We further grant G.M.'s unopposed motion to abbreviate his name as "Keisy G.M." in this opinion. The Clerk of Court is directed to amend the case caption to conform to the above.

† Circuit Judge Rosemary S. Pooler, originally a member of this panel, passed away on August 10, 2023. The two remaining members of the panel, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b).

constitutional guarantee of due process precludes a noncitizen's unreasonably prolonged detention under section 1226(c) without a bond hearing, and that *Mathews v. Eldridge*, 424 U.S. 319 (1976), supplies the proper framework for determining when and what additional procedural protections are due. In Black's case, we conclude that the district court properly required the government to show, at such a hearing, the necessity of his continued detention by clear and convincing evidence; it also correctly directed the IJ, in setting bond and establishing appropriate terms for potential release, to consider Black's ability to pay and alternative means of assuring appearance. We therefore affirm the district court's judgment granting habeas relief as to Black. As to G.M., we conclude that his detention had become unreasonably prolonged and accordingly reverse the district court's judgment denying habeas relief.

AFFIRMED, with respect to No. 20-3224, and REVERSED, with respect to No. 22-70.

_____

In No. 20-3224:

> Adedayo Idowu, Law Offices of Adedayo O. Idowu, New York, NY, *for* Carol Williams Black, *Petitioner-Appellee.*

> AMY BELSHER (Guadalupe Aguirre, Terry Ding, Christopher Dunn, *on the brief*), New York Civil Liberties Union Foundation, New York, NY, as Amicus Curiae *for* Carol Williams Black, *Petitioner-Appellee.*

> MARY ELLEN BRENNAN (Christopher Connolly, *on the brief*), Assistant U.S. Attorneys, Of Counsel, *for* Damian Williams, U.S. Attorney for the Southern District of New York, *for Respondents-Appellants.*

In No. 22-70:

> JULIE DONA (Aadhithi Padmanabhan, Laura Kokotailo, *on the brief*), The Legal Aid Society, New York, NY; Estelle M. McKee, Fei Deng, Student Counsel, Jordyn Manly, Student Counsel, Emma Sprotbery, Student Counsel, *on the brief*, Asylum and Convention Against Torture Clinic, Cornell Law School, Ithaca, NY, *for* Keisy G.M., *Petitioner-Appellant.*

MARY ELLEN BRENNAN (Jessica F. Rosenbaum, Benjamin H. Torrance, *on the brief*), Assistant U.S. Attorneys, Of Counsel, *for* Damian Williams, U.S. Attorney for the Southern District of New York, *for Respondents-Appellees*.

——————————

CARNEY, *Circuit Judge*:

These tandem appeals arise from habeas petitions brought under 28 U.S.C. § 2241 by Carol Williams Black (in No. 20-3224) and by Keisy G.M. (in No. 22-70). Black and G.M. (together, "Petitioners") are two legal permanent residents ("LPRs") who were detained by the government for many months without a bond hearing under the authority of 8 U.S.C. § 1226(c), pending conclusion of their separate removal proceedings. Section 1226(c) directs that the government "shall detain" noncitizens who are charged with removability based on a prior conviction on specified criminal grounds or on allegations of involvement with terrorism. It makes no explicit provision for an initial or other bond hearing during the period of detention and places no limit on the duration of detention under its authority.

Black and Williams each sought habeas relief, asserting that the prolonged detentions by the government—Black, for seven months, and G.M., for twenty-one months—without any bond hearing violated their Fifth Amendment rights to due process. The district court adjudicating Black's petition granted him relief. *Black v. Decker*, No. 20-cv-3055 (LGS), 2020 WL 4260994, at *9–10 (S.D.N.Y. July 23, 2020). The district court adjudicating G.M.'s petition denied relief. *Keisy G.M. v. Decker*, No. 21-cv-4440 (JPC), 2021 WL 5567670, at *1–2, *13 (S.D.N.Y. Nov. 29, 2021).[1] The government

———————

[1] G.M. was later released on grounds related to the COVID-19 public health emergency, by virtue of a nationwide injunction entered in *Fraihat v. ICE*, 445 F. Supp. 3d 709 (C.D. Cal. 2020). But the Ninth Circuit reversed the *Fraihat* order in October 2021. *Fraihat*, 16 F.4th 613, 647 (9th Cir. 2021). U.S. Immigration and Customs Enforcement ("ICE") is thus no longer barred by that

appeals the district court's judgment granting Black's petition; G.M., for his part, appeals the district court's judgment denying his.

On de novo review, we conclude that a noncitizen's constitutional right to due process precludes his unreasonably prolonged detention under section 1226(c) without a bond hearing. We further decide that *Mathews v. Eldridge*, 424 U.S. 319 (1976), supplies the proper framework for determining when and what additional procedural protections are due such a detainee. In Black's case, the district court properly required the government to show at such a bond hearing, by clear and convincing evidence, the necessity of his continued detention. It further correctly directed the immigration judge ("IJ"), in setting his bond and establishing appropriate terms for his potential release, to consider his ability to pay and alternative means of assuring appearance. As to Black, we therefore affirm the district court's judgment. As to G.M., we conclude that his detention had become unreasonably prolonged, and accordingly, we reverse.

## BACKGROUND[2]

### I.    Factual and Procedural History

#### A.    <u>Carol Williams Black</u>

Black is a native and citizen of Jamaica who was admitted to the United States as an LPR in 1983 at the age of twenty-one. He has lived here for the past forty years.

---

injunction from detaining G.M., and section 1226(c), as we have noted, directs the detention of noncitizens in G.M.'s position. So far as our record reflects, ICE has not detained G.M. anew. Still, because ICE has not disclaimed its intent or the requirement to detain him, G.M. remains "threatened with[] an actual injury traceable to the [respondents] and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation marks omitted). Thus, G.M.'s appeal seeking a bond hearing continues to present a live controversy under Article III.

[2] This factual statement is drawn from the evidence presented below, including the administrative materials before the IJs adjudicating Black's and G.M.'s cases. Any disputes are noted.

Before his detention in 2019, he lived in Mount Vernon, New York, with his wife of almost ten years and his stepdaughter. He owned and ran a boat repair business and was the sole income provider for his family. He was able, after working for ten years, to buy the home that he had been living in since 2007.

On December 4, 2019, ICE served Black with a Notice to Appear ("NTA") and took him into custody. The NTA charged him as removable under 8 U.S.C. § 1227(a)(2)(A)(iii) (aggravated felony conviction), and *id.* § 1227(a)(2)(E)(i) (child abuse, neglect, or abandonment), based on New York state convictions dating from 2000, when a jury convicted Black of sexual abuse in the first degree, *see* N.Y. Penal Law § 130.65(3), and endangering the welfare of a child, *see id.* § 260.10(1). Black was sentenced to and served concurrently five years' probation for each crime, completing his term in 2005.

ICE further determined that this criminal history made Black subject to detention under section 1226(c).[3] *See* 8 U.S.C. § 1226(c)(1)(B). During Black's seven-month detention, before he won habeas relief and was released on August 4, 2020, he appeared at seven master calendar hearings. At his fourth master calendar hearing, on March 16, 2020, the IJ denied his request for a change in custody status, found him to be ineligible for cancellation of removal, and denied his request for bond (and for a bond hearing).[4] At his seventh master calendar hearing, on June 8, 2020, the IJ adjourned proceedings to allow his counsel time to obtain documents supporting his then-pending application for

---

[3] The full text of section 1226(c) appears at note 9, *infra*.

[4] In his May 2020 written decision, the IJ explained that he "d[id] not need to address whether [Black] poses a danger to the community or if there is a risk of flight because [he] does not have jurisdiction to adjudicate the custody issue since [Black] is mandatorily detained under INA § 236(c)." Black App'x at 100 (citing *Jennings v. Rodriguez*, 583 U.S. 281 (2018), and *Shanahan v. Lora*, 583 U.S. 1165 (2018)).

asylum and withholding of removal. On June 20, 2023, the IJ ordered removal; Black's appeal to the BIA is currently pending.

In June 2020, Black filed an amended petition for habeas relief under 28 U.S.C. § 2241, contending primarily that his detention without a bond hearing, which by then had reached the six-month mark, violated due process. Applying a fact-specific multifactor test, the district court granted relief. *Black*, 2020 WL 4260994, at *7–9.[5] The court determined that the Constitution "entitled [Black] to an individualized bond hearing before an IJ" at which the government would bear the burden of "justify[ing] by clear and convincing evidence that [Black] poses a risk of flight or a danger to the community." *Id.* at *8–9. It required the IJ to consider Black's "ability to pay and the availability of alternative means of assuring his appearance" when setting a bond amount. *Id.* at *9. On remand, the IJ conducted the required hearing and ordered Black's release on a $15,000 bond.

B.    Keisy G.M.[6]

G.M. was born in the Dominican Republic in 1988. In 2011, he entered the United States as an LPR, and has mostly lived in the Bronx since then. In 2012, he was involved in a fight outside a restaurant in New York City; it led to state charges against him for

_____

[5] The court considered: (1) the length of time the petitioner has been detained; (2) the party responsible for the delay; (3) the petitioner's asserted defenses to removal; (4) whether the detention will exceed the time the petitioner spent in prison for the crime underlying his removal; (5) whether the immigration detention facility is different from a penal institution for criminal detention; (6) the nature of the crimes committed by the petitioner; and (7) whether the petitioner's detention is near conclusion. *See Black*, 2020 WL 4260994, at *7–9.

[6] G.M. moves to supplement the record on appeal with the BIA's December 2021 decision remanding his case to the IJ for consideration of his CAT deferral claims. The government similarly moves to supplement the record with (1) the IJ's June 2022 decision on remand, (2) a filing receipt of G.M.'s appeal to the BIA on July 5, 2022, and (3) documentation from DHS pertaining to G.M.'s release from custody. We grant both motions.

7

robbery and possession of stolen property. He was released on bail during the criminal proceedings. In May 2015, he pleaded guilty to second-degree assault in connection with that incident and was sentenced to two years' imprisonment followed by three years of supervised release. In December 2016, after being released early on parole, G.M. began living with his mother to assist with her medical needs.

Four years later, on October 5, 2020, ICE arrested G.M. at his home and served him with an NTA charging him with removability under 8 U.S.C. § 1227(a)(2)(A)(iii) based on his 2015 guilty plea. Characterizing the crime as an aggravated felony, ICE determined that section 1226(c) required that G.M. be detained, and placed him in the Hudson County Correctional Facility ("HCCF"). Over the next several months, G.M. appeared at seven master calendar hearings after numerous adjournments, delays occasioned in part by the need for his newly retained counsel to prepare his application for deferral of removal under the Convention Against Torture ("CAT"). COVID-19 restrictions then in place at HCCF hampered preparation.

In March 2021, the IJ denied G.M.'s application for CAT deferral, but in December 2021, on appeal, the BIA remanded for further analysis of G.M.'s claims that he would likely be tortured if he was returned to the Dominican Republic. In June 2022, the IJ again denied CAT relief, and G.M. again appealed. Since then, both G.M. and the government have submitted further briefing to the BIA, but no decision has issued.

G.M. sought habeas relief in May 2021, after about seven months of detention, alleging that his continued detention without a bond hearing violated his due process rights. Using the same multifactor test that Judge Schofield applied in Black's case, the district court reached a different conclusion and in November 2021 denied G.M.'s petition. *G.M.*, 2021 WL 5567670, at *7–13. By that time, G.M. had been detained for thirteen months and twenty-four days.

In July 2022, G.M. was released under a nationwide injunction entered in *Fraihat v. ICE*, 445 F. Supp. 3d 709 (C.D. Cal. 2020), *rev'd and remanded*, 16 F.4th 613 (9th Cir. 2021).[7] He ultimately spent twenty-one months in detention, and never received a bond hearing.

## II.     The Government's Detention Authority Under 8 U.S.C. § 1226

Section 1226 of title 8 authorizes the government to detain a noncitizen "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a); *see also Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) ("Section 1226(a) generally governs the process of arresting and detaining . . . aliens pending their removal.").[8] As the Court instructed in *Jennings*, "[s]ection 1226(a) sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of an alien" pending a removal decision, and "'may release' an alien detained under § 1226(a) 'on bond . . . or conditional parole.'" 583 U.S. at 288 (ellipses in original) (quoting 8 U.S.C. § 1226(a)).

Under section 1226(c), however, noncitizens who have committed one of certain listed offenses or who have been identified by the government as involved in terrorist activities are subject to mandatory detention. 8 U.S.C. § 1226(c)(1)(A)–(D). As mentioned above, this subsection specifies that the "Attorney General *shall* take into

---

[7] As noted above, *supra* note 1, the Ninth Circuit has since vacated the nationwide injunction that allowed G.M.'s release, *Fraihat*, 16 F.4th at 647, but as of this writing ICE has not returned him to detention.

[8] This opinion uses "noncitizen" rather than "alien" to refer to a "person not a citizen or national of the United States." *See* 8 U.S.C. § 1101(a)(3) (defining "alien"). *Cf. Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 103–04 (2009) (using "undocumented immigrant" instead of "illegal"). In quoted text, however, we retain the language used by the writer.

custody" any such noncitizen. *Id.* (emphasis added).[9] It addresses and allows release in extremely limited circumstances: "only if the Attorney General decides . . . that release of the alien from custody is necessary for [witness protection purposes]." *Id.* § 1226(c)(1)–(2).

The Supreme Court has held that detention under section 1226(c) without an *initial* bond determination does not, on its face, violate the detainee's due process rights where detention is "for the limited period of . . . removal proceedings." *Demore v. Kim*, 538 U.S. 510, 531 (2003). In *Demore*, Hyung Joon Kim, an LPR who had been detained under section 1226(c) for six months, challenged the constitutionality of the statute, arguing that detention with "no determination that he posed either a danger to society or a flight risk" violated his due process rights. *Id.* at 514, 530–31. The Supreme Court disagreed. Finding that Congress was "justifiably concerned" that criminal noncitizens

---

[9] Section 1226(c)(1) provides in full:

The Attorney General shall take into custody any alien who—

> **(A)** is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> **(B)** is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>
> **(C)** is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or
>
> **(D)** is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c).

would "fail to appear for their removal hearings in large numbers," the Court held that Congress "may," consistent with due process restrictions on government power, "require that persons such as respondent be detained for the brief period necessary for their removal proceedings" without an initial bond hearing. *Id.* at 513–14.[10]

The Supreme Court has also ruled that section 1226(c) itself authorizes prolonged detention. Indeed, it has construed the statute, together with section 1226(a), to provide that detention "*must* continue 'pending a decision on whether the alien is to be removed from the United States.'" *Jennings*, 583 U.S. at 303 (emphasis in original) (quoting 8 U.S.C. § 1226(a)). And the text of section 1226(c) does not require a bond hearing after some predetermined period of detention: in *Jennings*, the Court rejected the Ninth Circuit's reading of section 1226 to include a six-month cap as "implausible," and warned that "there is no justification for" identifying such a time limit "without any arguable statutory foundation." *Id.* at 296–97, 311–12.

Read together, then, *Demore* and *Jennings* instruct that (1) due process does not require an *initial* bond determination for those detained under section 1226(c), and (2)

---

[10] The U.S. Department of Justice's Executive Office for Immigration Review ("EOIR") reported as of October 2023 that a removal decision is completed in 94% of "detained cases" within six months of the start of detention. Exec. Off. for Immigr. Rev., Adjudication Statistics: Percentage of DHS-Detained Cases Completed Within Six Months 1 (Oct. 12, 2023), available at https://www.justice.gov/eoir/page/file/1163631/download [https://perma.cc/KBY8-Y8X2]. EOIR counts a "detained case" as "complete" upon "initial case completion." *Id.* at 1 n.1. It defines "initial case completion" as "the first dispositive decision rendered by an immigration judge," including "an order of removal, relief, voluntary departure, termination, or other." Exec. Off. for Immigr. Rev., Statistics Yearbook Fiscal Year 2018, at 6 (2019), available at https://www.justice.gov/eoir/file/1198896/download [https://perma.cc/GEY2-99CC]. This statement suggests that when a noncitizen is ordered removed but appeals that order, the case still counts as "complete" for the purpose of this statistic, even though the noncitizen remains detained pending a final decision on appeal. These are the circumstances faced by Petitioners. In some cases, noncitizens have waited in detention for more than four years without a decision, and without an individual bond determination—despite the distinct possibility that the proceeding will not culminate in removal. *See Reid v. Donelan*, 17 F.4th 1, 8 n.7 (1st Cir. 2021).

section 1226's text cannot be construed to require a bond hearing after any particular fixed period of detention.

Critically, however, *Demore* and *Jennings* leave open the question whether prolonged detention under section 1226(c) without a bond hearing will *at some point* violate an individual detainee's due process rights. They also do not teach what procedures due process may require, and whether due process principles (as opposed to section 1226(c)'s terms) may properly be understood to call for a bright-line rule as to timing or in any other respect. Indeed, the Court—having reached a statutory decision—remanded *Jennings* to the Ninth Circuit for consideration of the constitutional arguments in the first instance. *Id.* at 312.[11] We now face the same questions.

## DISCUSSION

We review de novo a district court's grant or denial of a habeas petition brought under 28 U.S.C. § 2241. *Velasco Lopez v. Decker*, 978 F.3d 842, 848 (2d Cir. 2020).

Black and G.M. agree that the government may detain noncitizens under section 1226(c) without an initial bond determination and that section 1226(c) applies to them. Both argue that their prolonged detentions without a bond hearing violated their due process rights. They urge that precedent supports adoption of a bright-line rule requiring a bond hearing after a section 1226(c) detention passes the six-month mark.[12]

---

[11] Neither the Ninth Circuit nor the District Court for the Central District of California has yet ruled on the merits of the constitutional challenge. The most recent decision in the *Jennings* litigation is a remand from the Ninth Circuit instructing the district court "to follow . . . the Supreme Court's instructions in *Jennings*." *Rodriguez v. Barr*, No. 20-55770, 2021 WL 4871067, at *1 (9th Cir. Oct. 19, 2021).

[12] G.M. frames his arguments under both the procedural and substantive due process rubrics, arguing that his detention under section 1226(c) runs afoul of the Supreme Court's general instruction that "due process requires that the nature and duration of commitment bear some

The government counters that, while in "an extraordinary case" a section 1226(c) detainee may have grounds to bring an as-applied constitutional challenge to the statute, neither Black's nor G.M.'s appeal presents such a case. Black Gov't Br. at 25–33; G.M. Gov't Br. at 31–36. Further, in the government's view, to impose a bright-line rule requiring bond hearings after six months' detention as a constitutional matter would conflict with *Jennings* and *DeMore*.

We consider, first, whether a noncitizen's right to due process precludes his unreasonably prolonged detention under section 1226(c) without a bond hearing. Concluding that it does, we then address how a court is to determine whether a noncitizen's detention has become so prolonged that such rights are fairly placed at issue. Finally, we address the procedures and standards applicable to Black's bond hearing.

## I.    A noncitizen's right to due process precludes his unreasonably prolonged detention under section 1226(c) without a bond hearing.

The Supreme Court long ago held that the Fifth Amendment entitles noncitizens to due process in removal proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993). The Constitution establishes due process rights for "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Accordingly, and as the Supreme Court recognized in *Zadvydas*, "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem." *Id.* at 690. In light of the constitutional concerns identified by the Supreme Court and this Court in connection

---

reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). Because the procedural and substantive due process inquiries overlap, and because—as G.M. acknowledges—any distinction between the resulting remedies would be "largely academic in this case," G.M. Reply Br. at 17–18 n.6, we do not separately address substantive due process concerns.

with the Executive's detention of noncitizens, and the authorities discussed below, we conclude that due process bars the Executive from detaining such individuals for an unreasonably prolonged period under section 1226(c) without a bond hearing.

In *Zadvydas*, for example, the Court heard a noncitizen's challenge to prolonged detention under 8 U.S.C. § 1231(a)(6). *Id.* at 682, 684–85.[13] Recognizing that the proceedings at issue were "civil, not criminal," and therefore "nonpunitive in purpose and effect," it pointed out that the government offered "no sufficiently strong special justification here for indefinite civil detention." *Id.* at 690. In response to the government's proffered justification of "preventing danger to the community," the Court explained that "[i]n cases in which preventive detention is of potentially *indefinite* duration, we have also demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger." *Id.* at 691 (emphasis in original). It ultimately avoided the constitutional challenge to section 1231(a)(6), however, by "constru[ing] the statute to contain an implicit 'reasonable time' limitation." *Id.* at 682. Thus, it held that the "statute, read in light of the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention." *Id.* at 689.

Even in *Demore*, where the Court upheld the facial constitutionality of detention under section 1226(c) without a bond hearing, it did so while emphasizing the apparent brevity of detentions pending removal. 538 U.S. at 527–31. In concluding that such mandatory detention comported with substantive due process, the Court highlighted

---

[13] Section 1231(a)(1)(A) allows the government ninety days to remove a noncitizen ("removal period") once a final removal order is issued. 8 U.S.C. § 1231(a)(1)(A). Section 1231(a)(6) authorizes detention beyond that removal period for certain categories of removable noncitizens, and places no explicit temporal limit on such a detention. *Id.* § 1231(a)(6).

two key distinctions between section 1226(c) detention and section 1231(a)(6) detention, the detention authority at issue in *Zadvydas*.

First, it observed that the noncitizens in *Zadvydas*—having been ordered removed but still being detained in the United States—"were ones for whom removal was 'no longer practically attainable,'" depriving detention of "its purported immigration purpose" of facilitating removal. *Id.* at 527.

Second, the Court pointed out that "the period of detention at issue in *Zadvydas* was 'indefinite' and 'potentially permanent,'" while "the detention [in *Demore*] is of a much shorter duration." *Id.* at 528. It cited data presented by the government to the effect that, for 85% of section 1226(c) detainees, "removal proceedings are completed in an average time of 47 days and a median of 30 days," and that "[i]n the remaining 15% of cases, in which the alien appeals the decision . . . , appeal takes an average of four months, with a median time that is slightly shorter."[14] *Id.* The Court's emphasis on this "limited" period of detention strongly suggests a view that, while it found detention without an initial bond determination to be facially constitutional, "indefinite" and "potentially permanent" detention without a bond hearing would violate due process. *Id.* at 529–31.

More than a decade later, this Court applied *Zadvydas* and *Demore* to a challenge to prolonged detention under section 1226(c) without a bond hearing—the same type of challenge we now address. In *Lora v. Shanahan*, Alexander Lora was detained under

---

[14] It appears that in *Demore* the government incorrectly informed the Court and that "[d]etention normally lasts twice as long as the Government then said it did." *Jennings*, 583 U.S. at 343 (Breyer, *J.*, dissenting); *see also* Letter from Ian Heath Gershengorn, Acting Solicitor Gen., to Scott S. Harris, Clerk, Supreme Ct. of the U.S. at 1 (Aug. 26, 2016), available at https://on.wsj.com/2sUWIGk [https://perma.cc/U3KR-C56W] (letter "to correct and clarify statements the government made in its submissions in *Demore v. Kim* . . . which this Court relied upon in its opinion").

section 1226(c) based on a drug-related conviction. 804 F.3d 601, 605 (2d Cir. 2015). After four months in detention, he sought habeas relief, challenging on due process grounds his continued detention without a bond hearing. *Id.* This Court, heeding the *Demore* Court's "[e]mphas[is] [on] the relative brevity" of section 1226(c) detention "in most cases," read Supreme Court precedent as having "made clear that the indefinite detention of a non-citizen raises serious constitutional concerns." *Id.* at 604, 606 (internal quotation marks and alterations omitted). We avoided those concerns, however, and followed *Zadvydas* by reading into section 1226(c) "an implicit temporal limitation" requiring that detainees be afforded a bond hearing after six months. *Id.* at 606.

The Supreme Court's subsequent decision in *Jennings* invalidated *Lora*'s statutory approach. *See Shanahan v. Lora*, 583 U.S. 1165 (2018). But in doing so, the Court did not answer the question whether due process places *any* limits on the government's detention authority under section 1226(c).[15] The Court's reversal of our statutory holding in *Lora* did not resolve the constitutional concerns we expressed in that case.

Our post-*Jennings* decision in *Velasco Lopez v. Decker*, concerning the government's discretionary detention authority under section 1226(a), highlighted the gravity of these concerns.[16] Velasco Lopez was taken into detention under section

---

[15] As already noted with respect to *Jennings*, *supra* note 11, neither this Court nor the Ninth Circuit has since had occasion to address the due process challenges that the Supreme Court left open in *Jennings* and *Lora*.

[16] Section 1226(a) provides:

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—

(1) may continue to detain the arrested alien; and

(2) may release the alien on—

1226(a). 978 F.3d at 846–47. Three and a half months later, he had an initial bond hearing, but bore the burden of proving that he was neither a flight risk nor dangerous. *Id.* at 847, 849 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 38 (B.I.A. 2006)). He had another bond hearing five months after the first, again unsuccessfully bearing the burden of proof. *Id.* at 847. After fourteen months in detention, he sought and was granted habeas relief. *Id.* at 847–48.

On appeal, we decided his petition on constitutional grounds. Recognizing the *Jennings* Court's admonition that section 1226(a) may not be read as implicitly imposing any specific procedural protections, *id.* at 851, we concluded that "Velasco Lopez's prolonged incarceration, which had continued for fifteen months without an end in sight or a determination that he was a danger or flight risk, violated due process," *id.* at 855. Notably, we rejected the government's contention that *Jennings* foreclosed all relief for Velasco Lopez, observing that the Court in *Jennings* had "expressly declined to reach the constitutional issues." *Id.* at 857.

Accepting the government's assertion that the Constitution "provides no basis for requiring bond hearings whenever the detention of a criminal noncitizen under § 1226(c)" exceeds any set duration, G.M. Gov't Br. at 31, we nonetheless read *Zadvydas*, *Demore*, *Jennings*, and *Velasco Lopez* to suggest strongly that due process places *some*

---

(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

(B) conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

8 U.S.C. § 1226(a).

limits on detention under section 1226(c) without a bond hearing. We cautioned accordingly in *Lora* (as mentioned above) that "serious constitutional concerns" would arise absent "some procedural safeguard in place for immigrants detained for months without a hearing." 804 F.3d at 614. The Constitution does not permit the Executive to detain a noncitizen for an unreasonably prolonged period under section 1226(c) without a bond hearing; at some point, additional procedural protections—like a bond hearing—become necessary.

**II.    We evaluate procedural due process challenges to prolonged section 1226(c) detention under the *Mathews* framework.**

When do additional procedural protections become constitutionally necessary? We begin by surveying other courts' approaches to this question post-*Jennings*. We then conclude that the *Mathews* framework applies generally, and will govern in individual cases.

A.    Courts' Approaches Post-*Jennings*

As described, neither the Supreme Court nor this Court has squarely decided a due process challenge to an individual's prolonged detention under section 1226(c). After *Jennings*, courts have taken a variety of approaches.

1. *The S.D.N.Y. Approach*

Courts in the Southern District of New York have used a multifactor, case-by-case analysis to determine whether the section 1226(c) petitioner's detention has become "unreasonable or unjustified." *E.g.*, *Cabral v. Decker*, 331 F. Supp. 3d 255, 261 (S.D.N.Y. 2018); *see also Jack v. Decker*, No. 21-cv-10958, 2022 WL 4085749, at *10 (S.D.N.Y. Aug. 19, 2022) (collecting cases taking this approach). In *Cabral*, Judge Koeltl highlighted that the *Jennings* court "left open the possibility that individual detentions without bond hearings might be so lengthy as to violate due process" and stressed the *Jennings*

18

Court's emphasis on "the flexible nature of the Due Process Clause." 331 F. Supp. 3d at 260. Observing that courts in the district had taken a "case-by-case approach to petitions for bail hearings," and rejecting the argument that the Constitution mandates a hearing in every case at six months, he identified the factors that had been considered as follows:

> (1) the length of time the petitioner has been detained;
>
> (2) the party responsible for the delay;
>
> (3) whether the petitioner has asserted defenses to removal;
>
> (4) whether the detention will exceed the time the petitioner spent in prison for the crime that made him removable;
>
> (5) whether the detention facility is meaningfully different from a penal institution for criminal detention;
>
> (6) the nature of the crimes committed by the petitioner; and
>
> (7) whether the petitioner's detention is near conclusion.

*Id.* at 261 (spacing altered).

### 2. *The Third Circuit Approach*

Since *Jennings*, the Third Circuit is the only federal court of appeals to have squarely ruled on the questions posed here.[17] *See German Santos v. Warden Pike County*

---

[17] In 2021, the First Circuit addressed the appeal of a class of section 1226(c) detainees who argued that "all persons detained under section 1226(c) have a constitutional right to a hearing concerning the reasonableness of their continued detention after they have been detained longer than six months." *Reid*, 17 F.4th at 7. In rejecting this contention, the *Reid* court acknowledged "that the Due Process Clause imposes some form of 'reasonableness' limitation upon the duration of detention under section 1226(c)," *id.* (internal quotation marks and alterations omitted), but did not address when and under what circumstances additional procedural protections are due.

The Fifth Circuit, in an unpublished opinion, also rejected a noncitizen's constitutional challenge to his continued detention under section 1226(c). In doing so, it focused instead on the statutory text, which as discussed above allows release in only extremely limited circumstances.

*Corr. Facility*, 965 F.3d 203 (3d Cir. 2020). There, petitioner German Santos was detained under section 1226(c) for over two-and-a-half years without a bond hearing, and sought habeas relief on due process grounds. *Id.* at 207–08.

Like the S.D.N.Y. courts, the Third Circuit "explicitly declined to adopt a presumption of reasonableness or unreasonableness of any duration." *Id.* at 211. Instead, it undertook a "highly fact-specific inquiry" that considered four factors: "the duration of detention," "whether the detention is likely to continue," "the reasons for the delay," and "whether the alien's conditions of confinement are meaningfully different from criminal punishment." *Id.* at 210–11 (internal quotation marks and alterations omitted). Applying these factors, the court concluded that German Santos's detention had become unreasonably long and ordered a bond hearing at which the government must justify continued detention by clear and convincing evidence. *Id.* at 212–14.

### 3. *The* Velasco Lopez *Approach*

Our October 2020 decision in *Velasco Lopez* bears on our determination here. As discussed, *Velasco Lopez* dealt with a Deferred Action for Childhood Arrivals recipient's challenge to his prolonged detention under the government's discretionary section 1226(a) authority. 978 F.3d at 847. We identified the "dispositive" issue there as "whether Velasco Lopez's ongoing incarceration posed due process concerns at the time of his habeas filing and whether additional procedural protections then became necessary." *Id.* at 851.

---

*Wekesa v. United States Att'y*, No. 22-10260, 2022 WL 17175818, at *1 (5th Cir. Nov. 22, 2022). One panel member wrote in dissent that he "would instead hold that Wekesa's prolonged detention without a bond hearing implicates due process protections and must be analyzed further." *Id*. at *2 (Dennis, *J.*, dissenting).

We held that the three-factor balancing test established in *Mathews*, 424 U.S. at 335, applied.[18] *See Velasco Lopez*, 978 F.3d at 851. The Supreme Court in *Mathews* identified three factors bearing on the constitutional need for procedural protections: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Applying these factors to Velasco Lopez's section 1226(a) detention, we determined that the district court "appropriately addressed the [asserted due process] violation by ordering a new hearing at which the Government was called upon to justify continued detention." *Velasco Lopez*, 978 F.3d at 855.

B.     The *Mathews* framework applies.

Here, we conclude that due process challenges to prolonged detention under section 1226(c) should also be reviewed under *Mathews*. Many courts have applied the *Mathews* factors, as we did in *Velasco Lopez*, to determine what process is due to noncitizens in removal proceedings. *Velasco Lopez*, 978 F.3d at 851; *see, e.g., Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1203–07 (9th Cir. 2022) (collecting cases that applied *Mathews* to determine process due to section 1226(a) detainees, and then assuming without deciding that *Mathews* applied to petitioner); *Miranda v. Garland*, 34 F.4th 338, 358 (4th Cir. 2022) (applying *Mathews* to conclude that due process did not require

---

[18] In *Mathews*, the Supreme Court considered whether due process "requires that prior to the termination of Social Security disability benefit payments the recipient be afforded an opportunity for an evidentiary hearing." 424 U.S. at 323. It concluded that an evidentiary hearing was not required before termination of disability benefits and that the existing administrative procedures comported with due process. *Id.* at 349.

additional procedural protections for section 1226(a) detainee); *Hernandez-Lara v. Lyons*, 10 F.4th 19, 27–28, 41 (1st Cir. 2021) (applying *Mathews* and concluding that government must prove that section 1226(a) detainee poses a danger to the community or a flight risk); *German Santos*, 965 F.3d at 213 (applying *Mathews* and concluding that at ordered bail hearing, government must show by clear and convincing evidence that section 1226(c) detainee should stay detained); *Guerrero-Sanchez v. Warden York County Prison*, 905 F.3d 208, 225 (3d Cir. 2018) (applying *Mathews* to identify due process requirements for noncitizen detained pursuant to ICE's section 1231 authority).[19]

The Supreme Court has also, in other contexts, applied *Mathews* to examine the adequacy of procedures provided to individuals in custody, including noncitizens legally present in the United States. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 528–29 (2004) (applying *Mathews* to assess whether due process entitled enemy combatant to evidentiary hearing to contest the basis for his detention); *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (observing that *Mathews* governs evaluation of noncitizen's claim that she was denied due process at her exclusion hearing); *Addington v. Texas*, 441 U.S. 418, 425–33 (1979) (observing that *Mathews* applies to assess adequacy of procedural safeguards for people subject to civil commitment).[20]

---

[19] The statutory holding in *Guerrero-Sanchez*—that "an alien detained under § 1231(a)(6) is generally entitled to a bond hearing after six months (i.e., 180 days) of custody," *Guerrero-Sanchez*, 905 F.3d at 226—was later abrogated by the Supreme Court in *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 576 (2022). *Arteaga-Martinez*, however, dealt only with whether the text of section 1231(a)(6) can be read to require, after six months of detention, a bond hearing at which the government bears the burden of proof. *See id.* It said nothing about the applicability of the *Mathews* framework to a *constitutional* challenge to prolonged detention under section 1231(a)(6), and the Court remanded the case for consideration of the constitutional claims in the first instance. *Id.* at 583. No further decisions in that litigation have been reported.

[20] *But see Dusenbery v. United States*, 534 U.S. 161, 167–68 (2002) (stating, in due process challenge to sufficiency of property forfeiture notice, that "we have never viewed *Mathews* as announcing an all-embracing test for deciding due process claims").

As the Ninth Circuit put it, *Mathews* "remains a flexible test," and takes account of individual circumstances. *Rodriguez Diaz*, 53 F.4th at 1206. It allows for what might appear to be "conflicting outcomes." *Id.* Applying *Mathews* comports with the Supreme Court's guidance in *Jennings* that "'due process is flexible,' . . . and … 'calls for such procedural protections as the particular situation demands.'" 583 U.S. at 314 (alteration omitted) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). And it can account for those concerns that the S.D.N.Y. and the Third Circuit have considered when deciding when detention has become unreasonably prolonged, and the detainee entitled to a bond hearing.

Thus, *Mathews* provides the proper framework to assess Black's and G.M.'s respective due process challenges.

The government offers three reasons not to apply the *Mathews* framework here. We find none persuasive. First, it contends that *Velasco Lopez* does not govern. It stresses that Velasco Lopez was detained under section 1226(a), rather than section 1226(c). Because he was already entitled to a bond hearing, the government asserts, his challenge focused not on the threshold need for a hearing but rather on whether the hearing procedures utilized were satisfactory. *See Velasco Lopez*, 978 F.3d at 851–54.

None of this suggests to us that *Mathews* should not apply to Petitioners' claims here. That *Velasco Lopez* dealt with section 1226(a) detention means only that the case is not directly binding here, not that its reasoning is irrelevant.[21] As to *Velasco Lopez*'s discussion of the differences between detention under section 1226(a) and under section 1226(c), that discussion followed the Court's determination that the *Mathews* framework

---

[21] And even so, the dispositive issue is the same: as remarked earlier, we phrased it as "whether Velasco Lopez's ongoing incarceration posed due process concerns at the time of his habeas filing and whether additional procedural protections then became necessary." *Velasco Lopez*, 978 F.3d at 851.

governed the challenge. We discussed those differences, in fact, as part of our analysis of the first and second *Mathews* factors. *See id.* So that observation carries little persuasive weight.

Second, the government argues that *Demore* applies directly here and forecloses our application of *Mathews*. But we do not read *Demore* so broadly. *Demore* upheld the government's authority under section 1226(c) to detain noncitizens without an initial bond hearing "for the brief period necessary for their removal proceedings." *Demore*, 538 U.S. at 513, 531. It said nothing about whether due process may *eventually* require a hearing. If *Demore* had, in fact, foreclosed the due process challenge now before us, the *Jennings* Court would have had no reason to remand to the Ninth Circuit "to consider . . . in the first instance" the detainees' argument that "[a]bsent . . . a bond-hearing requirement, . . . [section 1226(c)] would violate the Due Process Clause of the Fifth Amendment." *Jennings*, 583 U.S. at 291, 312.

Third, the government posits that "the *Mathews* framework does not necessarily apply simply because a case involves a procedural due process claim." Black Gov't Reply Br. at 17–18. It seeks support in the observation that "the Supreme Court has not referred to the *Mathews* balancing test in any case involving a challenge to immigration detention—including *Demore*—since [*Landon*]," G.M. Gov't Br. at 27–28. Largely for the reasons already discussed, however, this contention, too, fails. *Demore* did not present a due process challenge of the sort we now address. And the absence of a *Mathews* reference in any immigration detention decision since *Landon* means little when, so far as we can see, the Court has not had any subsequent occasion to address such a constitutional challenge at all.[22] We agree with the government that not all procedural

---

[22] *Demore* ruled on a due process challenge to the facial constitutionality of section 1226(c); *Zadvydas* and *Jennings* were decided on statutory grounds.

due process challenges require courts to apply the *Mathews* framework. *See Dusenbery*, 534 U.S. at 167–68. But the *Mathews* framework is apt for Petitioners' challenges.

As a final note, we find it troubling that the government offers no alternative framework for application here. Rather, it states only that "in an extraordinary case, a noncitizen detained under § 1226(c) may have grounds to bring an as-applied challenge asserting that his detention is unconstitutional," and then summarily concludes that Black's and G.M.'s appeals "present[] no such case." G.M. Gov't Br. at 31; *see also* Black Gov't Br. at 25. In our view, these appeals raise precisely such as-applied challenges, and are properly assessed under *Mathews*.

In adopting the flexible *Mathews* framework to assess, case by case, whether an individual's prolonged section 1226(c) detention violates due process, we also join the First and Third Circuits in rejecting a bright-line constitutional rule requiring a bond hearing after six months of detention—or after any fixed period of detention—in the context of a Congressional mandate, in the immigration context, to detain. *See Reid v. Donelan*, 17 F.4th 1, 7–9 (1st Cir. 2021); *German Santos*, 965 F.3d at 211. More broadly, we, too, "explicitly decline[] to adopt a presumption of reasonableness or unreasonableness of any duration" of detention. *German Santos*, 965 F.3d at 211.

*Demore* and *Zadvydas* imply, we agree, that any immigration detention exceeding six months without a bond hearing raises serious due process concerns.[23] We

_____

[23] Black argues that we should now simply adopt as law the constitutional analysis motivating our statutory ruling in *Lora* and hold that section 1226(c) detention beyond six months, without a bond hearing, per se violates a detainee's due process rights. G.M. argues similarly that, under *Lora*, a noncitizen's detention is likely to become unreasonable at the six-month mark. In *Lora*, we read into section 1226(c) "an implicit temporal limitation," "in order to avoid serious constitutional concerns." *See* 804 F.3d at 606. We read *Zadvydas* and *Demore* to "suggest that the preferred approach for avoiding due process concerns in this area is to establish a presumptively reasonable six-month period of detention." *Id.* at 615. *Zadvydas* was explicit that six months was a "presumptively reasonable period of detention" in the context of post-

nevertheless conclude that the Supreme Court's pronouncements in this context do not support imposing a bright-line rule as a matter of constitutional law.

The Supreme Court's jurisprudence regarding the government's authority to detain removable noncitizens under 8 U.S.C. § 1231(a)(6), while not binding here, is instructive. In *Zadvydas*, the Supreme Court recognized a "presumptively reasonable period of detention" of "six months," and required that beyond this period, if "there is no significant likelihood of removal in the reasonably foreseeable future, the Government . . . respond with evidence sufficient to rebut that showing" to justify continued detention. 533 U.S. at 701. This was the closest the Court has come to adopting a bright-line rule.

And *Jennings*, while also decided on statutory grounds, similarly suggests that a bright-line rule would be inappropriate in the constitutional context. The Court's remand order cautioned that "[d]ue process . . . calls for such procedural protections *as the particular situation demands*." 583 U.S. at 314 (emphasis added) (internal quotation marks omitted).

Here, too, the flexible due process analysis counsels against establishing a bright-line rule. Instead, courts hearing due process challenges to prolonged section 1226(c) detention should apply the *Mathews* framework to determine, case by case, whether and when due process requires that a particular detained noncitizen receive a bond hearing.

---

removal-period detention under section 1231(a)(6). 533 U.S. at 700–01. Much like our holding in *Lora*, the Supreme Court's statutory holding in *Zadvydas*, it explained, was motivated by constitutional concerns. *See id.* (describing Congress as "previously doubt[ing] the constitutionality of detention for more than six months"). Similarly, although the *Demore* Court upheld the facial constitutionality of Kim's prolonged detention without a bond determination under section 1226(c), it also stated that such detention was authorized only for the "limited period of his removal proceedings." 538 U.S. at 531. Kim himself had already been detained for six months, but the length of his detention was not at issue—only "the constitutionality of § 1226(c) itself." *Id.* at 514, 530–31.

**III.    Due process entitled Black and G.M. to individualized bond hearings to determine whether their continued detentions were justified.**

Turning to Black's and G.M.'s claims, we evaluate their respective circumstances under the *Mathews* factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

A.    Their Private Interests

In both cases, "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi*, 542 U.S. at 529). As we have previously observed, "[c]ase after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). True, in *Velasco Lopez*, we contrasted section 1226(a) detention with section 1226(c) detention, observing that "[t]he deprivation that Velasco Lopez experienced was not the result of a criminal adjudication." *Id.* And Petitioners' detentions in some sense were "the result of a criminal adjudication," since a conviction was the premise for applying section 1226(c). But each had served his entire sentence. And their detentions did not arise from new or unpunished conduct.

Moreover, much like someone detained under section 1226(a), Black and G.M. had "no administrative mechanism by which [they] could have challenged [their] detention on the ground that it reached an unreasonable length." *Id.* at 852. In approving detention for the pendency of removal proceedings, *Demore* was careful to emphasize the relatively short duration of section 1226(c) detention, stressing data

showing that detention under section 1226(c) lasts roughly a month and a half in 85% of cases, and four months where the noncitizen chooses to appeal. *See Demore*, 538 U.S. at 529. Both Petitioners here were detained for far longer, and their liberty interests more seriously infringed.

In addition, the private interests of both Petitioners were seriously affected by their prolonged detention. Black's seven-month-long detention led unsurprisingly to serious financial difficulties for his family. He was the sole income provider before his detention; he helped keep up their mortgage payments; and he cared for his wife as she experienced ongoing health issues. Similarly, G.M.'s family relied on him for financial support, and his mother counted on him for help in managing her medical conditions. G.M. is a father to three young children, two of whom were at his home when he was arrested by ICE. His third child was born while he was in ICE custody; when he filed his habeas petition, he had yet to meet her. G.M. also experienced his own health difficulties (in part leading to his *Fraihat* release), and his legal preparations were significantly delayed by COVID-19 restrictions at his detention facility. Many of these difficulties persisted throughout G.M.'s twenty-one-month detention—a detention that outstripped by two months his nineteen-month incarceration for the underlying assault.

For these reasons, we conclude that the first *Mathews* factor weighs heavily in favor of Black and G.M.

B.    The Risk of an Erroneous Deprivation of Their Interests and the Probable Value of Additional Procedural Safeguards

The second *Mathews* factor is "the risk of an erroneous deprivation of such [private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. It, too, weighs heavily in favor of Black and G.M. The only interest to be considered at this part of the *Mathews* analysis is that of the detained individuals—not the government. *See Hamdi*,

542 U.S. at 530. Here, the almost nonexistent procedural protections in place for section 1226(c) detainees markedly increased the risk of an erroneous deprivation of Petitioners' private liberty interests.

At the threshold, two general observations are in order with respect to section 1226(c) detention. First, the "procedures used" for section 1226(c) detainees are very few. *Mathews*, 424 U.S. at 355. They include no mechanism for a detainee's release, nor for individualized review of the need for detention. The only procedural protection in place is the *Joseph* hearing, at which noncitizens can contest whether they in fact committed a crime that makes them subject to mandatory detention. *See Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999). Even in the context of Velasco Lopez's section 1226(a) detention, where he received two bond hearings at which he bore the burden of proof, we concluded that "the procedures underpinning [his] lengthy incarceration markedly increased the risk of error." *Velasco Lopez*, 978 F.3d at 852. Section 1226(c) detainees receive even less procedural protection, and the risk of erroneous deprivation is correspondingly greater.

Further, as we remarked with concern in *Lora*, section 1226(c)'s broad reach means that many noncitizens are detained "who, for a variety of individualized reasons, are not dangerous, have strong family and community ties, are not flight risks and may have meritorious defenses to deportation at such time as they are able to present them." 804 F.3d at 605. Section 1226(c) sweeps in people convicted of many nonviolent offenses, *see id.* at 616, and does not take into account when the prior crime was committed, suggesting that the prior conviction may well be a poor proxy for a finding of dangerousness.[24]

_____

[24] As Justice Breyer once observed, section 1226(c) detainees "may have been convicted of only minor crimes—for example, minor drug offenses, or crimes of 'moral turpitude' such as illegally

These concerns were vindicated in the years after we decided *Lora*: Before *Jennings* vacated *Lora* in 2018, data showed that 62% of section 1226(c) detainees given bond hearings under *Lora* were released, confirming the absence in many cases of a sound justification for detention.[25] Similarly, in the First Circuit, where the district court in *Reid v. Donelan* had ordered bond hearings for a class of section 1226(c) detainees, almost half of those who had bond hearings were ordered released, having been found not to pose a danger or a flight risk. *See Reid*, 17 F.4th at 18 (Lipez, *J.*, dissenting).

It is in this context that we consider Black's and G.M.'s respective circumstances under the second *Mathews* factor.

In Black's case, no doubt remains that these minimal procedures led to an unwarranted detention. For the almost twenty years since his criminal conviction in March 2000, he led a peaceful life, helping to support his family. When he ultimately had the bond hearing ordered by the district court, he was released because the government could not justify his continued detention. As to Black, therefore, rather than worrying of a "risk" of erroneous deprivation, we can be virtually certain that his prolonged detention was unjustified.

In G.M.'s case, the record appears to show that for the four years after he completed his sentence (and while on bail pending the criminal proceedings), he led a lawful life. When, in 2014, G.M.'s roommate was murdered in front of G.M. and his family, G.M. assisted law enforcement with the investigation and eventually testified at

---

downloading music or possessing stolen bus transfers; and they sometimes may be innocent spouses or children of a suspect person." *Nielsen v. Preap*, 586 U.S. 392, 430 (2019) (Breyer, *J.*, dissenting).

[25] *See* Vera Inst. of Just., *Analysis of* Lora *Bond Data: New York Immigrant Family Unity Project (NYIFUP) October 28, 2015–July 31, 2016*, at 1 (2016), available at https://www.law.nyu.edu/sites/default/files/upload_documents/Vera%20Institute_Lora%20Bond%20Analysis_Oct%20%202016.pdf [https://perma.cc/7FEW-BBYR].

the trial of the murderer. During his four post-release years of freedom, he maintained steady employment and helped to provide for his family. And since his *Fraihat* release, no further criminal issues involving him have been brought to this Court's attention. Taken together with the general concerns noted above, G.M.'s circumstances similarly suggest a high likelihood that he was subject to an erroneous deprivation of liberty as his section 1226(c) detention was prolonged.

In the absence of any meaningful initial procedural safeguards, it appears to us that almost *any* additional procedural safeguards at some point in the detention would add value. The most obvious of these—and that sought by Petitioners—would be an individualized bond hearing at which an IJ can consider the noncitizen's dangerousness and risk of flight. As borne out by the bond hearings held under our decision in *Lora*, we expect that many detained noncitizens would be released after a bond hearing conducted to satisfy their due process protections.

We therefore conclude that the second *Mathews* factor, too, weighs heavily in favor of Black and G.M.

C.     <u>The Government's Interest</u>

The third *Mathews* factor considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. The government has identified two primary interests in support of unlimited mandatory detention: (1) ensuring the noncitizen's appearance at proceedings, and (2) protecting the community from noncitizens who have been involved in crimes that Congress has determined differentiate them from others. These interests are legitimate and their importance well-established. *See Demore*, 538 U.S. at 518–21, 527–28 (noting that section 1226(c) detention serves these dual purposes).

The government contends that these concerns persist unaltered until the noncitizen's removal proceedings are complete. But the additional procedural safeguards we would allow here under *Mathews* do nothing to undercut those interests. At any ordered bond hearing, the IJ would assess on an individualized basis whether the noncitizen presents a flight risk or a danger to the community, as IJs routinely do for other noncitizen detainees. *See, e.g.*, 8 U.S.C. § 1226(a). And while the government's legitimate interests justify a relatively short-term deprivation of liberty, *Demore*, 538 U.S. at 513, the balance of interests shifts as the noncitizen's detention is prolonged without any particularized assessment of need.

Just as in *Velasco Lopez*, here, too, "the Government has not articulated an interest in the prolonged detention of noncitizens who are neither dangerous nor a risk of flight." 978 F.3d at 854. To require that the Government justify continued detention "promotes the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose." *Id.* Where the noncitizen poses no danger and is not a flight risk, all the government does in requiring detention is "separate[] families and remove[] from the community breadwinners, caregivers, parents, siblings and employees." *Id.* at 855; *see also Rosales-Mireles v. United States*, 585 U.S. 129, 139 (2018) (observing that "any amount of actual jail time . . . has exceptionally severe consequences for the incarcerated individual and for society which bears the direct and indirect costs of incarceration" (internal quotation marks and alterations omitted)); *Mathews*, 424 U.S. at 347 (instructing that "the public interest" drives analysis of the third factor).

Both cases here illustrate this effect. Black was separated from his family, who relied on him as the sole income provider. G.M. lived peacefully with his mother, assisting with her medical needs while helping care for his two sons. By detaining them

for many months without an individualized assessment, the government eliminated vital support for Petitioners' families and, potentially, served no public interest.

The government also argues that the "fiscal and administrative burdens" of additional bond hearings would strain the immigration adjudication system yet provide little additional value. But just as the "burdens" argument failed to convince us in *Velasco Lopez*, we are not convinced here. Certainly, having to do something instead of nothing imposes an administrative and fiscal burden of some kind. But the Department of Justice reported an average cost of detaining noncitizens, in 2019, of $88.19 per prisoner per day.[26] Other estimates have placed the cost as high as $134 per day. *See Velasco Lopez*, 978 F.3d at 854 n.11 (citing Dep't of Homeland Security, U.S. Immigration and Customs Enforcement Budget Overview 14 (2018)). So, retaining and housing detainees imposes substantial costs as well. And, as far as we can tell, ICE may readily access the records of other law enforcement agencies for information bearing on its case for detention where necessary. *See* 8 U.S.C. § 1229a(c)(3)(B) (listing the various types of records that the government may reference in proving a criminal conviction for removal proceedings); *Velasco Lopez*, 978 F.3d at 853, 855 (observing that the government has "computerized access to numerous databases and to information collected by DHS, DOJ, and the FBI, as well as information in the hands of state and local authorities," and, for information not already at its fingertips, "broad regulatory authority to obtain it"). We expect that the additional resources that the government will need to expend to justify continued detention at bond hearings will be minimal—and will likely be outweighed by costs saved by reducing unnecessary detention. The government has

---

[26] Off. of Pub. Affairs, Dep't of Just., *Departments of Justice and Homeland Security Release Data on Incarcerated Aliens* (Oct. 16, 2020), available at https://www.justice.gov/opa/pr/departments-justice-and-homeland-security-release-data-incarcerated-aliens [https://perma.cc/68NY-GDLM].

therefore not substantiated its administrative burden argument sufficiently for it to weigh much against Petitioners' liberty interests.

For these reasons, we conclude that this third factor, too, favors Petitioners.

\*　　\*　　\*

Thus, applying the *Mathews* factors, we conclude that due process entitled Black and G.M. to individualized bond hearings by an IJ once their detentions became unreasonably prolonged.

**IV.   In the hearing it required for Black, the district court properly placed the burden on the government to justify Black's continued detention by clear and convincing evidence and directed the IJ to consider Black's ability to pay and alternatives to detention.**

In Black's case, in addition to ordering a bond hearing, the district court held that "[t]he burden at the bond hearing is on the Government to justify by clear and convincing evidence that Petitioner poses a risk of flight or a danger to the community," and that "the IJ must . . . consider Petitioner's ability to pay and the availability of alternative means of assuring his appearance." *Black*, 2020 WL 4260994, at \*9. The government challenges each of these rulings, and we now address them.[27]

In this, the *Mathews* factors again serve as our guide. Our analysis above of the first and third factors applies with equal force to these questions. We elaborate briefly on the second *Mathews* factor—the risk of erroneous deprivation and the probable value

---

[27] G.M., too, asks this Court to "clarify" on remand to the district court that the government bears the burden of justifying G.M.'s continued detention by clear and convincing evidence, and that the IJ must consider his ability to pay and alternatives to detention. G.M. Br. at 56–59. As the government correctly points out, however, because the district court in G.M.'s case denied him a bond hearing, it never reached the issue of what procedural requirements would follow. *See G.M.*, 2021 WL 5567670, at \*13; G.M. Gov't Br. at 36–37. The district court should consider these issues in accordance with the principles outlined in this opinion.

of additional procedural safeguards—in evaluating the specific procedures that will be required at Black's bond hearing, should one again be needed. *Mathews*, 424 U.S. at 335. We conclude that the district court properly directed the government to justify Black's continued detention by clear and convincing evidence and the IJ to consider both Black's ability to pay and any alternatives to detention.

A. <u>The district court properly determined that the government had to justify Black's continued detention by clear and convincing evidence.</u>

Where the government seeks to continue depriving a person of their liberty—especially when a district court has already found that deprivation to be unconstitutionally prolonged—we must require the government to bear the burden of proving the need for continued detention. Otherwise, "the risk of an erroneous deprivation" of a detainee's liberty interest would remain unacceptably high. *See Mathews*, 424 U.S. at 335.[28] In so concluding, we find persuasive the First Circuit's reasoning in the context of section 1226(a). *See Hernandez-Lara*, 10 F.4th at 30–32.

First, noncitizens—detained or not—are not entitled to counsel in removal proceedings. *See* 8 U.S.C. § 1362 (outlining the noncitizen's "privilege of being represented (at no expense to the Government)" in removal proceedings). According to a 2016 study by the American Immigration Council, only 14% of detained noncitizens are represented by counsel in their removal proceedings.[29] A significant factor in this alarmingly low rate is that noncitizens in such proceedings can be transferred to any

---

[28] A standard of proof "serves to allocate the risk of error between the litigants" and must reflect the "relative importance attached to the ultimate decision." *Addington*, 441 U.S. at 423.

[29] Ingrid Eagly & Steven Shafer, Am. Immig. Council, Access to Counsel in Immigration Court at 5 (Sept. 2016), available at https://www.americanimmigrationcouncil.org/sites/default/files/research/access_to_counsel_in_immigration_court.pdf [https://perma.cc/AN9B-FMX9].

ICE detention center, even one not located in the district of the alleged offense—take, for instance, G.M.'s overnight transfer, without notice, from HCCF (in New Jersey) to a county jail in Alabama.[30] Unsurprisingly, then, detained noncitizens often find themselves far from any community support that might help them to find representation. Similarly unsurprising is the finding that noncitizens represented at their bond hearings are about four times more likely to be released on bond than those who are unrepresented.[31]

Second, as demonstrated by G.M.'s case, detained noncitizens may have a much harder time preparing their cases because of difficulties in communicating with counsel and gathering evidence. *See Moncrieffe v. Holder*, 569 U.S. 184, 201 (2013) (noting that detained noncitizens have difficulty locating witnesses and collecting evidence); *Velasco Lopez*, 978 F.3d at 852–53 (describing how Velasco Lopez was prevented from appearing in criminal proceedings while detained by ICE). Further, like G.M., most noncitizens appearing in immigration proceedings lack English proficiency and require an interpreter, making preparation of their cases more difficult while in detention—with or without a lawyer.[32]

---

[30] *See* Locked Up Far Away: The Transfer of Immigrants to Remote Detention Centers in the United States, Hum. Rts. Watch (Dec. 2, 2009), available at https://www.hrw.org/report/2009/12/02/locked-far-away/transfer-immigrants-remote-detention-centers-united-states [https://perma.cc/4U7Z-NZ2A].

[31] Eagly & Shafer, *supra* note 29.

[32] Laura Abel, Brennan Ctr. for Just., Language Access in Immigration Courts 3 (2011), available at https://www.brennancenter.org/sites/default/files/legacy/Justice/LangAccess/Language_Access_in_Immigration_Courts.pdf [https://perma.cc/SQJ6-KALL] ("[M]ore than 85% of people appearing before the Immigration Courts are [limited English proficiency]."); Dep't of Just., Language Access in Immigration Court, DM 23-02, at 1–2 (noting that "most noncitizens who appear in immigration courts require . . . interpretation").

Finally, as the First Circuit observed, "proving a negative (especially a lack of danger) can often be more difficult than proving a cause for concern." *Hernandez-Lara*, 10 F.4th at 31 (citing *Elkins v. United States*, 364 U.S. 206, 218 (1960)). Requiring that detainees like Black prove that they are *not* a danger and *not* a flight risk—after the government has enjoyed a presumption that detention is necessary—presents too great a risk of an erroneous deprivation of liberty after a detention that has already been unreasonably prolonged.

The government raises two arguments in opposition. First, it points to the provision in section 1226(c) allowing release of a detailed noncitizen for witness protection purposes only if the *noncitizen* "satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(c)(2). The government contends that, where the statute's text requires the noncitizen to bear the burden of persuasion in one circumstance, this Court cannot conclude in another that due process requires the government to bear the burden.

We read section 1226(c)(2), however, as having "nothing to do with bail." *Jennings*, 583 U.S. at 351 (Breyer, *J.*, dissenting). Rather, it concerns "a special program, the Witness Protection Program, set forth in 18 U.S.C. § 3521," in which the government would usually be required to detain the noncitizen based on a presumption of dangerousness and flight risk. Section 1226(c)(2) allows the Attorney General to "release" the noncitizen in this limited circumstance, potentially doing "far more" than granting bail: instead, it would be "freeing the witness from a host of obligations and restraints, including those many obligations and restraints that accompany bail." *Id.* Section 1226(c)(2) says nothing about who should bear the burden of proof at a bond hearing once detention has been deemed unconstitutionally prolonged. We will not

assume that procedures governing "far more" than *discretionary* release for protected witnesses will meet the requirements for a *constitutionally required* bail proceeding.

The government's second argument is that, under BIA precedent, even those noncitizens discretionarily detained under section 1226(a) must demonstrate that they are not flight risks or dangers to the community before release. Black Gov't Br. at 36 (citing *Matter of Guerra*, 24 I. & N. Dec. at 40). The government suggests that our decision in *Velasco Lopez* means that the noncitizen, even when not subject to mandatory detention, has been allowed to shift the burden to the government only at second or third bond hearings—and not at the initial bond hearing. Accordingly, the government asserts, the noncitizen subject to mandatory detention must bear the burden at the first hearing.

We find this argument unpersuasive. It is rooted neither in the text of section 1226 nor in our reasoning in *Velasco Lopez*. Both sections 1226(a) and (c) aim to prevent flight and danger to the community. Once those detentions have been unconstitutionally prolonged, the due process analysis adopted in *Velasco Lopez* applies with equal force to both situations. Accepting the government's argument would lead to an asymmetrical, puzzling result: section 1226(a) detainees like Velasco Lopez, who had already received (and did not prevail at) an initial bond hearing, would at future bond hearings be entitled to shift the burden to the government to prove the need for continued detention; section 1226(c) detainees like Black, who never had a similar opportunity to show at an initial hearing that he should be released, would bear the burden of proof. Accordingly, we conclude that once detention under section 1226(c) has become so prolonged that due process warrants a bond hearing, as in Black's case, the government must justify continued detention at such a hearing.

As for what that justification could be, we again view *Velasco Lopez* as instructive, and we require only that the government justify continued detention by clear and

convincing evidence. *See* 978 F.3d at 855–57. Where an individual's liberty is at stake, the Supreme Court has consistently used this evidentiary standard for continued detention. *See, e.g.*, *United States v. Comstock*, 560 U.S. 126, 129–31 (2010) (instructing that under a federal statute permitting continued confinement of "mentally ill, sexually dangerous federal prisoner[s] beyond the date the prisoner would otherwise be released," the government must prove its claims by clear and convincing evidence); *Foucha v. Louisiana*, 504 U.S. 71, 75–76 (1992) (requiring proof by clear and convincing evidence for involuntary civil commitment); *Salerno*, 481 U.S. at 751 (observing that pretrial detention is permitted when the government can justify its need by clear and convincing evidence). We see no reason here to deviate from this approach.

B.     The district court properly required the IJ to consider Black's ability to pay and alternatives to detention in setting a bond amount.

The district court in Black's case also properly required the IJ to consider Black's ability to pay and alternatives to detention when setting any bond amount. Once again, we are guided principally by our *Mathews* analysis. The "risk of an erroneous deprivation" of the noncitizen's liberty if alternatives to detention and ability to pay are not considered at the ordered bond hearing is the focus of our concern. *See Mathews*, 424 U.S. at 335. Our analysis is informed by the government's legitimate interests in protecting the public and in ensuring that noncitizens appear for their removal proceedings, and by the caution that any detention incidental to such interests must "bear[] [a] reasonable relation to" those interests. *Zadvydas*, 533 U.S. at 690 (internal quotation marks omitted) (second alteration by *Zadvydas* Court) (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)).

As an initial matter, a bond amount would be at issue only once the IJ has determined that the noncitizen does not pose a danger to the community. *See Carlson v. Landon*, 342 U.S. 524, 539–42 (1952) (finding no due process violation where there is

39

cause to believe noncitizen's release would pose a safety risk); *Matter of Guerra*, 24 I. & N. Dec. at 38 ("An alien who presents a danger to persons or property should not be released during the pendency of removal proceedings."). At that point, refusing to consider ability to pay and alternative means of assuring appearance creates a serious risk that the noncitizen will erroneously be deprived of the right to liberty purely for financial reasons. *Cf. Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983) (holding that revocation of probation for failure to pay fines, without first considering ability to pay or alternatives to imprisonment, "would be contrary to the fundamental fairness required by the Fourteenth Amendment").[33]

The government resists, arguing that "the district court's unqualified requirement that the immigration judge consider alternatives to detention and Black's ability to pay a bond improperly obligated the immigration judge to consider those factors notwithstanding a potential finding that Black . . . posed a danger to the community." Black Gov't Br. at 38–39. We do not read the district court's order in that way: it required only that "the IJ . . . consider Petitioner's ability to pay and the availability of alternative means of *assuring his appearance*." *Black*, 2020 WL 4260994, at *9 (emphasis added). The district court said nothing about considering ability to pay and alternative means of assuring appearance *despite* a finding that the noncitizen is a danger to the community. But to the extent the district court's order might be read as the government suggests, we stress that a showing of dangerousness by clear and

---

[33] Like the Ninth Circuit, "we cannot understand why [the government] would ever refuse to consider financial circumstances . . . [n]or can we understand why the government would refuse to consider alternatives to monetary bonds that would also serve the same interest the bond requirement purportedly advances." *Hernandez v. Sessions*, 872 F.3d 976, 991 (9th Cir. 2017).

convincing evidence would foreclose any possibility of bond. The IJ would then have no reason to consider financial circumstances or alternatives to detention.

The government next submits that ordering consideration of these factors interferes with the "'broad discretion'" to be afforded an IJ in determining a noncitizen's eligibility for release on bond. Black Gov't Br. at 39 (quoting *Matter of Guerra*, 24 I. & N. Dec. at 40). An IJ, it says, may consider financial circumstances and alternatives to detention, but has discretion to consider many different factors and "may choose to give greater weight to one factor over others, as long as the decision is reasonable." *Id.* (quoting *Matter of Guerra*, 24 I. & N. Dec. at 40). We agree, and we do not read the district court's order as saying otherwise. The IJ does indeed have broad discretion in setting terms and can exercise that discretion by considering a multitude of relevant factors. Requiring that two of those factors be alternatives to detention and the noncitizen's ability to pay does nothing to constrain its discretion: the IJ is free to give as much or as little weight to these factors as appropriate, as long as *some* weight is given, and "as long as the decision is reasonable." *Matter of Guerra*, 24 I. & N. Dec. at 40.

## CONCLUSION

For the foregoing reasons, we conclude that the Fifth Amendment's guarantee of due process precludes a noncitizen's unreasonably prolonged detention under section 1226(c) without a bond hearing. We further decide that the *Mathews* framework applies when determining when and what additional procedural protections are due. In Black's case, the district court properly granted Black's petition, required a bond hearing be conducted, and further required the government to show at such a bond hearing, by clear and convincing evidence, the need for Black's continued detention. And it correctly directed the IJ conducting Black's bond hearing to consider his ability to pay and alternative means of assuring his appearance. In G.M.'s case, the district court erred

41

by concluding that his prolonged detention comported with due process, denying his petition, and failing to order a hearing.

We therefore **AFFIRM** the judgment of the district court in No. 20-3224, and we **REVERSE** the judgment of the district court in No. 22-70.